# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

BILLY M. WALKER,            )
                           )
       Plaintiff,         )
                           )
      vs.                )  **Case No. 2:16CV0018 PLC**
                           )
GLEN BABICH, et al.,      )
                           )
       Defendants.     )

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court[1] on the motion for summary judgment (ECF No. 53) filed by Defendants Glen Babich, M.D., Sarah Starks, Tammie Anderson, and Corizon, LLC. Plaintiff opposes the motion. (ECF No. 62). Plaintiff, an inmate at the Northeast Correctional Center (NECC) in Missouri, suffers a seizure disorder, as well as multiple sclerosis (MS) and/or traumatic brain injury. Plaintiff filed a complaint under 42 U.S.C. § 1983 against Corizon, the contracted medical provider for the Missouri Department of Corrections (MDOC), and three Corizon employees. Plaintiff alleged that Defendants violated the Eighth Amendment by acting with deliberate indifference to his serious medical needs when they denied him, among other things, access to his prescribed pain and anti-seizure medications.

Defendants deny the allegations and move for summary judgment arguing that the undisputed evidence shows that Plaintiff received continuous and adequate care and, therefore, Defendants were not deliberately indifferent to Plaintiff's serious medical needs. (ECF Nos. 19 & 53) Plaintiff counters that material factual disputes preclude summary judgment. (ECF No. 62)

---

[1] The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c). (ECF No. 46)

## I.    Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Hill v. Walker, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant does so, the non-movant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." Id. at 324 (quotation marks omitted).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). The court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

## II.    Background

The medical history and records in this case are extensive.[2] In October 2010, and again in December 2012, Plaintiff, who was then incarcerated at Jefferson City Correctional Center, suffered stroke-like symptoms and was transported by ambulance to St. Mary's Hospital. After

---

[2] In considering Defendants' motion for summary judgment, the Court will "take as true those facts asserted by plaintiff that are properly supported in the record." Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001); see Pool v. Sebastian Cty., Ark., 418 F.3d 934, 944 (8th Cir. 2005).

the December 2012 episode, a prison physician prescribed Plaintiff gabapentin,[3] Tylenol, Robaxin, and methocarbamol. At that facility, Plaintiff received his daily medications consistently at 8:00 a.m., 2:00 p.m., and 8:00 p.m.

MDOC transferred Plaintiff to NECC in March 2013. At the time of his transfer, Plaintiff was taking methocarbamol and gabapentin three times per day. One week after transferring to NECC, Plaintiff wrote a letter to NECC's director of nursing, memorializing their conversation about "watch-take medication call-outs."[4] (ECF No. 63-1) Plaintiff complained that he was receiving his medication "at all different hours," and this inconsistent administration of medication exacerbated his symptoms.[5] Id.

In April 2013, Dr. Cabrera, a Corizon doctor noted Plaintiff's "very unsteady leaning gait" and ordered him a wheelchair and a cane. (ECF No. 56-1 at 23) Later that month, Plaintiff saw another Corizon doctor, Dr. Archer for numbness in his leg and foot, and Dr. Archer continued Plaintiff's analgesic regimen.[6] According to Plaintiff, Dr. Archer also stated that he would order Plaintiff an MRI and physical therapy, but failed to enter these orders into the electronic record system. (Id. at 24-25, 33)

---

[3] Gabapentin "works in the brain to prevent seizures and relieve pain for certain conditions in the nervous system. . . . Gabapentin is an anticonvulsant." (ECF No. 64-20 at 2) The National Center for Biotechnology Information (NCBI) warns: "Do not stop taking this medicine suddenly. Your doctor will need to slowly decrease your dose before you stop it completely. If you take this medicine to prevent seizures, your seizures may return or occur more often if you stop this medicine suddenly." (Id. at 3)

[4] In his declaration, Plaintiff explained: "In order to receive medications, inmates must wait for med-line to be called for their housing unit to go to medical. Med-line is supposed to be called at NECC four times per day." (ECF No. 63 at ¶ 18)

[5] Plaintiff explained: "I have always taken my medication at 8:00 a.m., 2:00 p.m., and 8:00 p.m. . . . Yesterday I received my morning medication approximately 2:00 p.m., then at approximately 7:00 p.m. and then again at 11:30 p.m. Today, morning medication was at 2:30 p.m." (ECF No. 63-1)

[6] However, Plaintiff refused his methocarbonal at several medication call-outs because he believed it "made [his] condition worse." (Id. at 25, 26, 27, 29)

Plaintiff's medication administration records reveal that Plaintiff's gabapentin prescription expired on May 5, 2013. (ECF No. 65-1 at 5)  Dr. Archer refilled the prescription on May 7, 2013, but lowered the dosage from 600 mg three times per day to 400 mg three times per day. (Id. at 6)

Plaintiff continued to inquire about the MRI purportedly ordered by Dr. Archer.[7] Plaintiff states in his declaration that, at his next appointment with Dr. Archer in July 2013, Dr. Archer informed Plaintiff that his orders for an MRI and physical therapy had "fallen through the cracks." (ECF Nos. 63 at ¶ 25; 63-3 at 4)  Dr. Archer noted that Plaintiff "presents to clinic for evaluation of neck and back pain, however, during this clinic visit, provider observed more pertinent neurological problems," such as "wide based unsteady gait, requiring cane dependence[.]" (ECF No. 56-1 at 34)  Dr. Archer continued Plaintiff's gabapentin and referred him for a consultation with an outside neurologist, which Corizon's assistant regional medical director approved.

At the request of the neurologist, Dr. Batchu, Plaintiff underwent a brain MRI prior to his August 2013 visit.  The MRI revealed "some white matter disease," and Dr. Batchu diagnosed Plaintiff with:  "[s]pastic ataxia with left C3-4 sensory level.  Possible cervical spinal stenosis

_____

[7] In a June 2012 letter to Corizon's director of nursing, Plaintiff wrote:  "I am writing in regards to an order issued by Dr. Archer.  I seen [sic] him about six weeks ago and he told me that he was going to send me out for an MRI and that he wanted me to start physical therapy.  I have been watching the call-outs and I have not been called out for either one of these." (ECF No. 63-2 at 2)  Plaintiff explained:

> Recently, I had another episode where I was talking to another inmate and my left side went completely numb and I lost my speech. . . . Everything went a little sideways.  I became nauseated.  I had a real bad metallic taste in my mouth, which lasted for four or five days. . . . I am not having a lot of problems with my left side becoming numb and painful. . . . It[']s a numbing and painful feeling at the same time.  The left side of my neck becomes painful like a muscle spasm or something.  It's really hard to describe."

Id.

4

and related myelopathy"; "[m]ildly abnormal MRI brain that could be with post traumatic changes from the TBI vs early Multiple Sclerosis but definitely does not correspond to his current gait problems"; and [h]istory of Multi Trauma including head injury." Id. Dr. Batchu recommended MRIs of Plaintiff's cervical and thoracic spine and prescribed baclofen.[8] (ECF Nos. 65-9, 56-1 at 34-35)

Ten days after his visit with Dr. Batchu, Plaintiff filed his first Informal Resolution Request (IRR),[9] alleging that the NECC warden "is allowing [Corizon] to deny me medication and treatments ordered by Dr. Archer and [Dr. Batchu]." (ECF No. 63-3 at 3) More specifically, Plaintiff alleged that two days after his appointment with Dr. Batchu, a nurse informed him that Corizon had denied the MRIs and baclofen recommended by Dr. Batchu. Plaintiff explained: "In the last week, my condition has worsened and now the muscle spasms have moved up into my arms and neck. My feet are swelling and I'm having problems wearing my shoes." Id. at 5. Corizon's regional medical director approved the MRIs the same day,[10] and Plaintiff began receiving baclofen five days later. (ECF Nos. 56-1 at 50, 65-1 at 9)

---

[8] "Baclofen is used to help relax certain muscles in your body. It relieves the spasms, cramping, and tightness of muscles caused by medical problems such as multiple sclerosis or certain injuries to the spine. Baclofen does not cure these problems, but it may allow other treatment, such as physical therapy to be more helpful in improving your condition." (ECF No. 64-21 at 2) The NCBI advises: "Do not stop using this medicine suddenly without asking your doctor. You may need to slowly decrease your dose before stopping it completely." (Id. at 3) Dr. Batchu recommended baclofen on August 27, but Plaintiff did not begin receiving it until September 11. (ECF Nos. 56-1 at 34-35, 65-1 at 9)

[9] In order to exhaust MDOC's administrative grievance process, an inmate must first file an IRR. If the inmate is unsatisfied with the response to the IRR, he may file an "offender grievance" and, if unsatisfied with the response to that response, he may file an "offender grievance appeal." Once the inmate receives a response to the grievance appeal, the administrative process is deemed exhausted. See Human v. Hurley, No. 2:17-CV-8-ERW, 2018 WL 1519376, at 3-4 (E.D. Mo. March 28, 2018).

[10] The MRI's, performed the following month, revealed "questionable punctate enhancing focus in the cord at c3 on the left." (ECF No. 65-11; see also ECF Nos. 56-1 at 53, 65-7)

Corizon allowed Plaintiff to follow up with Dr. Batchu in mid-October 2013. (ECF No. 56-1 at 53) At that appointment, Plaintiff reported that the 10-mg dose of baclofen was "not helpful" and he believed his spasms and gait were worsening. (Id.) Dr. Batchu recommended doubling Plaintiff's baclofen to 20 mg four times per day and doubling his gabapentin to 1200 mg three times per day. (Id. at 54) Dr. Batchu also provided a presumptive diagnosis of MS and requested a spinal tap to evaluate, which Corizon's regional medical director approved. (Id. at 54, 57)

Dr. Archer requested the medications recommended by Dr. Batchu, and Plaintiff began receiving the increased gabapentin and baclofen on October 17, 2013. (ECF No. 65-1 at 11) However, on November 1, a correctional officer searched Plaintiff and discovered two gabapentin pills in his shirt pocket. (ECF No. 63-4) Plaintiff explained that, because the medical unit did not dispense his medications on a consistent schedule, he was saving the gabapentin so he could self-administer the medication at the same time every day. (Id.) Plaintiff's medication administration records reflect that a doctor ordered his gabapentin discontinued the same day. (ECF No. 65-1 at 11)

On November 18, Plaintiff declared a medical emergency for a headache and, the following day, submitted a medical service request for renewal of the gabapentin. (ECF No. 56-1 at 62) On November 20, 2013, Plaintiff met with Dr. Archer and questioned the discontinuation of his gabapentin. (Id. at 60)[11] On November 22 and December 6, Plaintiff filed

---

[11] Dr. Archer explained that Plaintiff "had violated an underlying pain agreement when he diverted his watch-take pain medications." (ECF No. 56-1 at 60) Dr. Archer terminated the interview because Plaintiff "became increasingly argumentative" and "hostile." Id. The record contains a letter Plaintiff wrote to Dr. Archer later that day, apologizing for his "harsh words." (ECF No. 63-5) In the letter, Plaintiff explained that he was "not a drug addict" but was "scared of dying here." (Id.) Plaintiff wrote:

IRRs, requesting immediate continuation of his gabapentin.[12]  (ECF Nos. 64-12, 63-8)

Plaintiff suffered a severe seizure on January 11, 2014.[13]  (ECF No. 63-9).  Two days later, Dr. Archer reinstated Plaintiff's gabapentin prescription at 600 mg three times per day, which was half his previous dosage.  (ECF No. 65-1 at 14)  Dr. Archer also prescribed

---

> I don't know what happened to me.  Last December I was doing fine and within 3 ½ months, I can't walk.  What happened?  Before December I was able to run.  I was very active and could keep up with all the younger guys.  Now, I can't do anything without help from the younger guys and the problem has only gotten worse.  The medication helps me get around better, but it's not the cure…..Right now, I [am] so stressed out and worried about this medical condition that I don't know what to do.  It's been days since I slept more than two hours and I've had this constant headache for more than three days.  It feels like my head is going to explode. . . .I don't know what to do. . . I only want to know what is wrong with me; what caused it; and how I can fix it.

(Id.)  Plaintiff wrote Dr. Archer another letter on November 25, pleading for his medication. (ECF No. 63-6)  In regard to his worsening condition, Plaintiff wrote:

> Without [the medication] my equilibrium is completely out of control.  My hand coordination is gone especially on my left side.  I can't move from one side of my cell to the next without the cane because my leg control is so bad and the nerves are completely gone, which has now moved up into my left arm and neck.  So without the wheelchair I can't leave my cell.

(Id. at 3)

[12] In his IRR of December 6, 2013, Plaintiff complained that Dr. Archer discontinued his medication without notice or instructions on "when and how to stop taking it" and "use[d] the medication as a sanction for violating a rule."  (ECF No. 63-8)  Plaintiff claimed that, as a result of the abrupt discontinuation of his gabapentin, he had suffered three seizures.  Finally, Plaintiff expressed frustration that "no one is willing to address the real problem with how this watch take medication is being administered in this prison."  (Id. at 3)  Plaintiff explained that gabapentin is "suppose[d] to be taken at the same time every day.  Here, it may be 8:00 a.m. one day, but the next it may be 10:00 a.m. or 11:00 a.m. the next day or may not be at all until 2:00 p.m., which this [sic] violates the [sic] time between doses should never exceed 12 hours."  Id.

[13] Plaintiff acknowledges that his seizures that occurred between November 1, 2013 and January 17, 2014 do not appear in the medical records.  (ECF No. 62-1 at ¶ 69)  Keith Williams, Plaintiff's cellmate at the time, completed an affidavit attesting that he witnessed the January 11 seizure, as well as others.  (ECF No. 63-9)  In his affidavit, Mr. Williams stated that, on January 11, 2014 at approximately 4:30 a.m., noise and movement from Plaintiff's bunk awoke him, and he saw Plaintiff "contorting up into a ball and shaking out of control."  (ECF No. 63-9 at 2) After trying and failing to wake up Plaintiff, Mr. Williams pushed the emergency call button. After correctional officers arrived, Plaintiff stopped shaking but remained unresponsive.  The officers placed Plaintiff in his wheelchair and ordered Mr. Williams to wheel Plaintiff to the medical unit.  When Plaintiff "finally came out of it, he was confused and did not know where he was" and he "asked for his watch-take medications."  (Id. at 2)

levetiracetam[14] 500 mg twice per day and added physical therapy to Plaintiff's treatment plan. (Id.)  Plaintiff only had one session with the physical therapist.  (ECF No. 56-1 at 68)

Plaintiff returned to Dr. Batchu's office on February 12 to discuss the results of his spinal tap.  (Id. at 71)  Dr. Batchu diagnosed Plaintiff with seizure disorder and "possible multiple sclerosis," and he recommended:  prescribing steroids, replacing levetiracetam with oxcarbazepine[15]; increasing Plaintiff's gabapentin to 1200 mg three times per day;[16] ordering lab work to rule out Sjogren's Syndrome; and administering a transcutaneous electrical nerve stimulation (TENS) unit.  (ECF No. 65-13 at 2)

Based on Dr. Batchu's recommendations, Dr. Archer prescribed:  methylprednisolone sodium succinate injections, prednisone, IV solu-medrol, oxcarbazepine, baclofen, gabapentin 600 mg, and Ensure.  (ECF No. 56-1 at 82)  Corizon's assistant regional medical director denied the requested lab work and TENS unit," but approved Plaintiff for a follow-up appointment with Dr. Batchu.  (ECF No. 56-1 at 87, 88)  At Plaintiff's March 2014 appointment, Dr. Batchu recommended prednisone, oxcarbazepine, tizanidine,[17] and a TENS unit.  (ECF Nos. 56-1 at 90; 65-15)

Plaintiff received a solu-medrol infusion in February 2014 and prednisone tablets in April 2014.  (ECF Nos. 56-1 at 85, 65-1 at 22)  In April, an on-site physicians noted "modest, clinical improvement" with the IV steroids and increased his gabapentin.  (ECF No. 56-1 at 89-90)

---

[14]  Levetiracetam is an anticonvulsant "used to help control certain types of seizures in the treatment of epilepsy."  (ECF No. 64-22 at 2)

[15]  Oxcarbazepine is an anticonvulsant "used alone or together with other medicines in the treatment of epilepsy to control partial seizures."  (ECF No. 64-23 at 2)

[16]  Dr. Archer did not order the increased dosage of gabapentin recommended by Dr. Batchu until March 3. (ECF No. 65-1 at 19)  Plaintiff began receiving the higher dose on March 6.  Id.

[17]  Tizanidine treats muscle spasticity.  (ECF No. 64-24)  "It relieves spasms, cramping, and tightness of the muscles caused by medical problems, such as multiple sclerosis or certain injuries to the spine."  Id.  Plaintiff's tizanidine prescription expired in July 2014 and was not renewed.  (ECF No. 65-1)

However, when Plaintiff's prescription for gabapentin 1200 mg expired on May 27, 2014, a physician, without explanation, renewed the prescription for only 600 mg. (ECF No. 65-1) In May and June 2014, Plaintiff repeatedly complained to Corizon doctors and nurses that the medical staff was not providing him the proper dosage of gabapentin, distributing his medications at regular times, or promptly refilling expired prescriptions. (ECF No. 56-1 at 92-93, 96)

Plaintiff filed two more IRRs on June 4 and June 5, 2014. (ECF Nos. 64-13, 64-14) Plaintiff alleged that Corizon's staff was neither dispensing prescribed medications properly nor providing proper treatment for his MS and/or traumatic brain injury. Id. Plaintiff alleged that his condition was worsening and that Corizon had denied Dr. Batchu's and Dr. Archer's repeated requests for steroid injections because "they cost too much." (ECF No. 64-14 at 4) Plaintiff requested a "medication pass card" so he could receive his watch-take medications at the same time each day, approval of steroid injections, and "whatever it's going to take for the brain injury."[18] (ECF Nos. 64-13, 64-14) The assistant director of nursing denied Plaintiff's IRRs. (ECF No. 56-1 at 97)

On June 12, 2014, Plaintiff saw Dr. Cabrera, who noted that "Dr. Batchu has recommended several meds [which] either was [sic] not approved or did not work." (ECF No. 56-1 at 96) Dr. Cabrera also determined that "Patient is on enough pain meds and muscle relaxant to take care of his pains. I am not ordering anything for him today." Id. Several days later, Plaintiff's daughter called the medical unit and expressed concern that Plaintiff was still receiving only 600 mg doses of gabapentin instead of the prescribed 1200 mg. (Id. at 97)

---

[18] In response to Plaintiff's IRR regarding inconsistent distribution of medications, the assistant director of nursing, Nina Zumwult, responded: "[Y]ou have refused your medicines several times – med line pass times were explained to you and you did not want to listen to the explaining [sic] stating you already knew all of that." (ECF No. 64-13 at 3)

In July 2014, Plaintiff repeatedly advised the medical staff that his seizures had worsened with the decrease in gabapentin and requested they increase the dosage to the 1200 mg three times per day that Dr. Batchu recommended. (Id. at 100-03) On August 5, Dr. Pryor increased Plaintiff's gabapentin to 800 mg three times per day.[19] (ECF No. 65-1 at 31) Later that month, Dr. Babich approved Plaintiff's referral to Dr. Batchu. (ECF No. 56-1 at 101, 103)

Dr. Batchu examined Plaintiff on August 11, 2014. (ECF No. 56-1 at 103, 108) Dr. Batchu again recommended increasing Plaintiff's gabapentin and oxcarbazepine. (Id.) He also recommended resuming Plaintiff's tizanidine and a repeat MRI of Plaintiff's "c-spine and head to re-evaluate these given the increase in seizure activity." (Id. at 107)

On August 14, Plaintiff informed a Corizon nurse that "nothing that [Dr. Batchu] ordered has been done." (Id. at 109) Five days later, Plaintiff had an appointment with Dr. Pryor who requested the interventions recommended by Dr. Batchu. (Id.) However, Dr. Babich, then Corizon's assistant regional medical director, denied the tizanidine because it was "non-formulary."[20] (ECF No. 56-1 at 122) Dr. Babich also denied the requested MRIs, directing Dr. Pryor to wait and see if the increased dosage of gabapentin controlled Plaintiff's seizure. (Id. at 109)

On August 20, 2014, Plaintiff did not receive his baclofen or gabapentin, and he renewed his request for his medications, explaining "that he has got to have his seizure medicines that he is having 3-4 seizures a day and that this is killing him." (ECF Nos. 56-1 at 110, 65-1 at 31-32) The chronic care nurse explained to Plaintiff that they were awaiting approval of the increased

_____

[19] On August 6, Plaintiff presented to the medical unit with a headache and reported that he did not receive his gabapentin on the previous day. (ECF No. 56-1 at 105)

[20] In his deposition, Dr. Babich explained: "Formulary medication means that when the doctor puts the order in, it goes straight through the pharmacy, is ordered and dispensed. Non-formulary means it has to go through the UM, utilization management[, meaning Corizon's regional office must approve the request]." (ECF No. 56-2 at 70)

gabapentin prescription.  Id.  On August 22, Plaintiff resumed his baclofen and began receiving 1200 mg doses of gabapentin three times per day.  (ECF No. 65-1 at 32)

In early September 2014, Plaintiff met with Dr. Proctor and reported feeling "much better back on his drugs, no further seizures."  (ECF No. 56-1 at 113)  In October, Plaintiff's seizure activity remained stable but his neurological symptoms were "progressive."  (Id. at 122)  Dr. Rardin noted that the tizanidine and MRIs recommended by Dr. Batchu had been denied, and she submitted another request for MRIs "to aid in diagnosis, which would direct therapy[.]"  (Id.)  Dr. Babich approved the MRIs, which revealed mild disc degenerative changes and "T2 high signal foci in cerebral hemispheres." (Id. at 123)

In late October 2014, Plaintiff presented to Dr. Rardin with "transient new symptoms, persistence of old symptoms."  (Id.)  Plaintiff described "transient episodes of exaggerated tremor, rest and intention.  No clear trigger.  Trouble coordinating his legs.  Pain at the very top of the scalp with palpation . . . .  Decreased appetite, weight loss, night sweats.  Seizures now under better control with higher dose of trileptal."  (Id.)  Dr. Rardin referred Plaintiff for a follow-up appointment with Dr. Batchu, and Dr. Babich approved the referral.  (Id. at 124-25)

Although Plaintiff requested renewal of his medications on November 6 and 14, Corizon allowed his gabapentin prescription to expire on November 17.  (ECF Nos. 56-1 at 128-129, 65-22, 65-1 at 36)  When Plaintiff renewed his request for gabapentin on November 18, a nurse practitioner recommended Plaintiff "alleviate his pain with Tylenol first to see if it works." (ECF No. 56-1 at 127)

At his appointment with Dr. Batchu on November 25, Plaintiff reported "problems with seizures" because "meds have been changed."  (Id. at 125)  In his declaration, Plaintiff stated that, during the November visit, Dr. Batchu "expressed concern that Corizon continued to fail to

follow his recommendations[.]" (ECF No. 63 at ¶ 58)  Dr. Batchu recommended decreasing

Plaintiff's oxcarbazepine, placing Plaintiff back on gabapentin, and switching Plaintiff to Lyrica

if Corizon would not approve the gabapentin. (ECF No. 65-17)

    On November 29, Plaintiff submitted a written "health services request," stating: "I got

to have something for these shakes.  I need my medication back."  (ECF No. 65-21 at 2)  On

December 1, Plaintiff self-declared a medical emergency because he was "having a flare-up of

MS" and "uncontrollable jerking movements with shocking sensation."  (ECF No. 56-1 at 133,

134)  Nurse Starks suggested that Plaintiff was faking his symptoms, but Dr. Pryor assessed

Plaintiff with "seizures – with myoclonic jerks," which began with the discontinuation of

gabapentin, and "hyponatremia with change to trileptal."  (ECF No. 56-1 at 129, 63 at ¶ 57)

Although Dr. Pryor ordered renewal of Plaintiff's gabapentin and continuation of the baclofen

that day, Plaintiff did not begin receiving the gabapentin until December 3.[21]  (ECF Nos. 56-1 at

29, 65-1 at 37)  Nor did Plaintiff receive his oxcarbazepine December 1 through December 3.

(ECF No. 65-1 at 37)

    In early January 2015, Plaintiff wrote a letter to the Missouri Board of Registration for

the Healing Arts, which he copied to NECC's warden and Nurse Anderson, the assistant director

of nursing, complaining that Corizon doctors were not treating his MS/brain injury and Corizon

had denied "shots for MS" and TENS unit recommended by Dr. Batchu. (ECF No. 63-10 at 5)

Additionally, Plaintiff stated:  "Every time that the gabapentin and baclofen expire, Dr. Batchu

renews it, but the rest of the [Corizon] doctors refuse to renew it and I suffer through seizures,

---

[21] On December 3, Plaintiff met with Dr. Rardin "discuss medication issues." (ECF No. 56-1 at 129)  Dr. Rardin noted:  "It is unclear why he went without gabapentin for a few days, as there are multiple approved orders with no time gaps."  (Id.)  Dr. Rardin further ordered that stopping Plaintiff's oxcarbazepine, without explanation "was inappropriate," and she renewed Plaintiff's gabapentin and baclofen prescriptions, adding that they "should not be discontinued without MD approval – one have ever been discontinued by myself."  (Id. at 130)

myoclonic jerks and severe muscle spasms for weeks before they eventually renew it. . . . I've taken these medications since 2009 and when they suddenly stop them, they do it without warning." (Id. at 5) Plaintiff explained that he had used the offender grievance procedure "but the medical staff refuses to answer my informal complaints." (Id. at 3) Plaintiff pleaded: "I wake up every morning with a different symptom and I am going through many episodes of . . . myoclonic jerks, which are killing me." (Id. at 6)

Several weeks later, Plaintiff wrote a letter to NECC's warden informing him that Corizon was not providing proper treatment for Plaintiff's serious medical needs, specifically traumatic brain injury, epilepsy, and MS. (ECF No. 63-11 at 4) Plaintiff also inquired why he had not received the corticosteroid injections, TENS unit, and Ensure recommended by Dr. Batchu. (Id.) The warden forwarded Plaintiff's letter to Nurse Anderson and sent Plaintiff a written response, referring him to the offender grievance process. (ECF No. 63-12)

On February 2, 2015, Plaintiff filed IRR No. 15-144, which he directed to Drs. Pryor, Bredeman, and Babich. (ECF No. 64-15) Plaintiff alleged that the doctors' refusal to treat his MS and traumatic brain injury constituted cruel and unusual punishment, and he renewed his request for the corticosteroid injections, TENS unit, and Ensure.[22] Nurse Starks, then assistant director of nursing, responded to Plaintiff's IRR on February 8, pointing out that Plaintiff began receiving injections earlier that month and had "been seen by an off-site neurologist multiple

---

[22] Plaintiff received his first Interferon Beta-1a injection that day. (ECF No. 56-1 at 1486) Interferon Beta-1a injections are "used to treat the relapsing forms of multiple sclerosis (MS). This medicine will not cure MS, but it may slow some of the disabling effects and decrease the number of relapses of the disease." (ECF No. 64-25 at 2) In his deposition, Dr. Babich opined that Dr. Batchu's decision to recommend Interferon injections "impl[ied] that Dr. Batchu finally made a commitment in saying [Plaintiff's diagnosis] was MS as opposed to his working diagnosis where he was oscillating between traumatic brain injury and MS." (ECF No. 56-2 at 99) Plaintiff received Interferon injections from February through December 2015. (ECF No. 65-1)

times." (Id. at 2-3)

Plaintiff appealed Nurse Starks' response by filing an offender grievance with the health services administrator. (Id. at 4) In his appeal, Plaintiff acknowledged that he began receiving corticosteroid and Interferon Beta-1a injections in early February 2015. (Id. at 6) Plaintiff nevertheless complained about the long delay in receiving this treatment, and reiterated his complaint that, each time his seizure medications expired, "it took two to three weeks to get them renewed." (Id. at 10) The health services administrator denied the grievance, explaining that Plaintiff "had been seen by the physicians at the site and referred off site to specialist" and "you have been receiving multiple medications as determined by the site physicians for your chronic problems." (Id. at 5)

In April 2015, Plaintiff appealed the denial of IRR No. 15-144, pointing out that the health services administrator's response did not explain why he was not receiving the recommended treatments. (ECF No. 64-4 at 2) In August, Plaintiff received a response from Corizon's director of operations, reviewed and signed by Dr. Babich, denying Plaintiff's appeal. (Id. at 3) The response, which referred to an incisional hernia and kidney surgery, entirely failed to address Plaintiff's claims.[23]

Shortly after filing IRR No. 15-144, Plaintiff filed IRR No. 15-168, alleging that Nurses Anderson and Zumwult "alter[ed] my medical records and files, which has resulted in a long

_____

[23] The director's response characterized Plaintiff's complaint as follows: "you have an abdominal hernia, because you were discharged from the hospital too soon following your nephroureterectomy. . . ." (ECF No. 64-4 at 3) The response went on to conclude that Plaintiff had "a reducible incisional hernia which is not related to your kidney surgery last year" and "your hernia is reducible and does not require a surgical procedure at this time." Id. Plaintiff had not undergone kidney surgery and did not have an incisional hernia. At his deposition, Dr. Babich acknowledged the "disconnect" between Plaintiff's grievance and the grievance appeal response. (ECF No. 56-2 at 80-81)

delay in receiving the serious and necessary medical treatment ordered by [Dr. Batchu.]" (ECF No. 64-16 at 4) Plaintiff also claimed that the alteration of his files "has caused me extreme pain and suffering for over a year and nine (9) months, specifically every ninety (90) days when my watch-take medications expire." (Id. at 5)

Nurse Starks denied Plaintiff's IRR, and Plaintiff appealed by filing an offender grievance. (Id. at 3, 6) The health services administrator denied Plaintiff's grievance, stating that she "was unable to determine what exactly you thought the physician did not have available to review to support his treatment," and Plaintiff filed an offender grievance appeal. (Id. at 7, 8) Corizon's director of operations denied Plaintiff's appeal, finding "the medical staff at NECC did make available the appropriate information for review by the offender/outside specialist." (Id. at 9) Dr. Babich reviewed and signed the director of operations' response. Neither the grievance response nor the grievance appeal response addressed the underlying problem – the long, unexplained interruptions in his medical treatment.

In January 2016, Plaintiff filed two additional IRRs, complaining that: (1) he had not received his prescribed, weekly Interfon Beta-la injections in eight weeks; and (2) medical staff regularly allowed his chronic care, watch-take medications to expire and, despite Plaintiff's timely requests, did not promptly renew his prescriptions. (ECF Nos. 64-18, 64-19) Plaintiff explained that these interruptions in medical treatment caused Plaintiff "to suffer nerve pain, seizures, convulsions and…critical mental confusion." (ECF No. 65-19 at 2)

### III.    *Discussion*

Defendants move for summary judgment on Plaintiff's claim that their deliberate indifference to his serious medical needs violated Plaintiff's rights under the Eighth Amendment. More specifically, Defendants argue that Plaintiff failed to demonstrate that they were

deliberately indifferent to his medical needs because the undisputed evidence shows that "Plaintiff's care and treatment were never delayed[.]"[24]  (ECF No. 54 at 4)  Defendants further assert that Plaintiff's mere disagreement with the course of medical care does not give rise to deliberate indifference.

Plaintiff opposes summary judgment on the ground that his voluminous medical records demonstrate that Defendants were aware of his numerous serious medical serious conditions and exhibited deliberate indifference.  In particular, Plaintiff maintains that Defendants demonstrated deliberate indifference by disregarding Dr. Batchu's recommendations, abruptly discontinuing his medications "sometimes for months at a time" and "without regard for the consequence to [his] conditions," and ignoring Plaintiff's complaints.  (ECF No. 62 at 3)

Deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment.  Wilson v. Seiter, 501 U.S. 294, 297 (1991); Estelle v. Gamble, 429 U.S. 97, 105 (1976).  To establish deliberate indifference, an inmate must show that (1) he suffered an objectively serious medical need and (2) the defendants knew of the need but deliberately disregarded it.  Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004).  "Deliberate indifference is more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation."  Fourte v. Faulkner Cty., Ark., 746 F.3d 384, 387 (8th Cir. 2014) (internal quotations and citations omitted).

"Deliberate indifference may include intentionally denying or delaying access to medical

---

[24] In their motion of summary judgment, Defendants present a cursory argument that Plaintiff failed to demonstrate that he suffered objectively serious medical needs.  (ECF No. 53) However, Defendants neither developed this argument nor presented facts to support it.  Because the undisputed facts refute the claim that Plaintiff did not have serious medical needs, the Court will not address it.

care, or intentionally interfering with treatment or medication that has been prescribed." Pietrafeso v. Lawrence Cty., 452 F.3d 978, 983 (8th Cir. 2006) (quoting Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995)); see also Estelle, 97 U.S. at 105. For example, "[d]elay in the provision of treatment or in providing examinations can violate inmates' rights when the inmates' ailments are medically serious or painful in nature." Dadd v. Anoka Cnty., Minn., 827 F.3d 749, 755 (8th Cir. 2016) (quoting Johnson-El v. Schoemehl, 878 F.2d 1043, 1055 (8th Cir. 1989)). See also Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010).

There is no real dispute that Plaintiff's seizure disorder and possible MS and/or traumatic brain injury were serious medical needs. Additionally, Plaintiff's electronic medical records, letters to prison and Corizon officials, and IRRs demonstrate that Defendants knew about his conditions. Thus, the Court must determine whether the evidence presented by Plaintiff creates a material dispute of fact regarding whether Defendants, with deliberate indifference, denied Plaintiff access to medications causing him to suffer severe spasms, seizures, and pain. The Court will address each defendant separately.

*A. Dr. Babich*

Dr. Babich maintains he is entitled to summary judgment because, during the period of time in which he was the assistant regional medical director at NECC, he did not disregard Plaintiff's serious medical needs. In support of his position, Dr. Babich asserts that he regularly approved referrals for Plaintiff to see Dr. Batchu, as well as medications and tests recommended by on-site physicians, and he "never denied a physician request without an alternative treatment plan suggestion." (ECF No. 54 at 5) Plaintiff counters that Dr. Babich was deliberately indifferent in denying the requested MRI, which Dr. Batchu had recommended, in August 2014. (ECF No. 62 at 10) Plaintiff also argues that Dr. Babich's failure to properly consider his

offender grievance appeals constituted deliberate indifference. (Id.)

Dr. Babich worked as the assistant regional medical director for Corizon in Missouri between June 15, 2014 and November 29, 2015. In his deposition, Dr. Babich explained that, as assistant regional medical director, he was responsible for "utilization management," or reviewing requests from on-site physicians, who "might be passing on a recommendation from the specialist," for special procedures or non-formulary medications. (ECF No. 56-2 at 17)   In determining whether to approve requested a procedure or medication, Dr. Babich considered "whether it met evidence-based medicine and was medically appropriate and necessary."[25]   (Id. at 19)   Dr. Babich stated he did not consider cost when making utilization management decisions. (Id. at 21)

In regard to his decision to deny the MRI recommended by Dr. Batchu in August 2014, Dr. Babich explained that Dr. Pryor requested the MRIs before implementing the interventions recommended by Dr. Batchu. (Id. at 37)  Dr. Babich determined that "there's no point in doing the after assessment if the treatment wasn't even initiated," so he directed Dr. Pryor to increase Plaintiff's gabapentin dosage, per Dr. Batchu's recommendation, before administering the MRI. When Dr. Rardin observed, in October 2014, that Plaintiff's neurological symptoms were progressive, she submitted another request for the MRIs, and Dr. Babich approved that request.

"[N]othing in the Eighth Amendment prevents prison doctors from exercising their independent professional judgment." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996). Dr. Babich did not simply deny outright the requested MRIs. Rather, Dr. Babich directed the on-site physicians to implement the other interventions recommended by Dr. Batchu and then reevaluate

---

[25] Dr. Babich later elaborated:  "What I'm looking at is whether it's going to be appropriate to assisting in the patient's diagnosis or assisting in determining their treatment plan. And if it has a bearing in that, then it may have medical necessity. If it's not going to impact a treatment plan or diagnosis, then it doesn't have a medical necessity." (ECF No. 56-2 at 21-22)

the need for MRIs. When, a couple months later, Plaintiff's neurological symptoms had not improved with the changes to his medications, Dr. Babich approved the MRIs. The Court therefore finds that Dr. Babich was not deliberately indifferent, but rather exercised his independent medical judgment when he denied the requested MRI in August 2014. "Disagreement with a medical judgment is not sufficient to state a claim for deliberate indifference to medical needs." Foster v. Lombardi, No. 1:12-CV-116-JAR, 2014 WL 636042, at *7 (E.D.Mo. Feb. 18, 2014) (quoting Reynolds v. Crawford, 2:06-CV-9-ERW, 2007 WL 1656269, at *3 (E.D. Mo. June 6, 2007) (internal quotations and citations omitted)).

Plaintiff also relies on Dr. Babich's role in the offender grievance process to establish his deliberate indifference to Plaintiff's serious medical needs. The Court recognizes that "[t]he denial of grievances, in and of itself, cannot support a substantive constitutional claim." Haley v. CMS, 1:09-CV-144-SNLJ, 2012 WL 4108924, at *3 (E.D. Mo. 2012) (citing Lomholt v. Holder, 287 F.3d 683 (8th Cir. 2002)). However, Dr. Babich's decision to deny Plaintiff's offender grievance appeal is not the basis for Plaintiff's claim of deliberate indifference. Rather, Plaintiff bases his claim on Dr. Babich's failure to investigate Plaintiff's claims, or even review his grievance and medical file, to ensure he received appropriate treatment for his serious medical condition.

Dr. Babich's responsibilities as assistant regional medical director included reviewing offender grievance appeals to determine whether the inmate received appropriate medical treatment. In his deposition, Dr. Babich explained that an "independent reviewer," or grievance officer, paid by Corizon "makes the review and then it's passed to [Dr. Babich] so that I can make sure that there's not a medical issue that's being overlooked." (ECF No. 56-2 at 77-78) Along with the grievance officer's response, Dr. Babich received for his review the offender

grievance appeal and "some selected medical records." If Dr. Babich found that the treatment was not appropriate, he would "contact[] the site and get[] them back on track with treatment." (Id. at 84)

Dr. Babich affirmed that he reviewed and signed the responses to Plaintiff's offender grievance appeals of IRRs Nos. 15-168 and 15-144. (Id. at 76, 79)  In his appeal of grievance No. 15-144, Plaintiff complained of the delay in providing him corticosteroid injections and renewed his requests for a TENS unit, Ensure, and treatment for traumatic brain injury. Additionally, Plaintiff complained that Dr. Babich regularly delayed renewing Plaintiff's prescriptions for Neurontin, baclofen, and oxcarbazepine so that Plaintiff "had to suffer every 90 days for two or three weeks when my medications would expire." (ECF No. 64-15 at 9)

Dr. Babich acknowledged that, although he signed the response to Plaintiff's offender grievance appeal, the response (referencing a hernia and kidney surgery) did not correspond to Plaintiff's grievance. When Plaintiff's asked whether Dr. Babich's signature on the response signified that "that [he] reviewed this document and that it is an appropriate response," Dr. Babich answered, "I am reviewing the response. I'm not reviewing the grievance itself." (Id. at 81)

Although Dr. Babich was not a treating physician, he was responsible for ensuring inmates received appropriate care by approving certain treatments and medications and reviewing offender grievance appeals. Dr. Babich approved the denial of Plaintiff's grievance appeal without, it appears, even reading Plaintiff's grievance or reviewing his medical records. The Eighth Circuit has held that "fail[ure] to inquire appropriately into a prisoner's medical condition may provide evidence of deliberate indifference sufficient to survive summary judgment." Faruq v. Vickers, 531 Fed. Appx. 760, 761 (8th Cir. 2013) (quoting Sanchez v.

Taggart, 144 F.3d 1154, 1156 (8th Cir. 1998)).

Furthermore, "the knowing failure to administer prescribed medicine can itself constitute deliberate indifference." Phillips v. Jasper Cty. Jail, 437 F.3d 791, 795-96 (8th Cir. 2006) (reversing summary judgment for jail employees because there was a genuine issue of fact regarding the inconsistent administration of the plaintiff's anti-seizure medications). For example, the record reveals that Plaintiff did not receive the proper dosage of gabapentin from May 27, 2015 (shortly before Dr. Babich assumed the position of assistant regional medical director) until August 22, 2015. Additionally, although Dr. Batchu began recommending Interferon and corticosteroid injections in February 2014, Plaintiff did not begin receiving them until February 2015.

Because Plaintiff brought his complaints of inadequate medical care to Dr. Babich's attention by way of the offender grievance process, and Dr. Babich did not investigate those complaints, there is a material dispute as to whether he was deliberately indifferent. Dadd, 827 F.3d at 756 ("[The plaintiff's] medical need was clear and he had already been prescribed medicine that was deliberately withheld from him. Accepting [the plaintiff's] allegations as true, the…decision to ignore [the plaintiff's] complaints were not based on 'a medical judgment,' but rather indifference."). Dr. Babich is therefore not entitled to summary judgment.

*B. Nurse Anderson*

Nurse Anderson asserts that she is entitled to summary judgment on Plaintiff's deliberate indifference claim because the allegations concerning her "are general in nature and do not include any specific facts with regard to her role in the alleged indifference." (ECF No. 54 at 6) Plaintiff counters that there is a genuine dispute of fact as to Nurse Anderson's deliberate indifference because Nurse Anderson acknowledged "having interactions with [him]," received

his written complaints, and either signed or responded to five of Plaintiff's IRRs. (ECF No. 62 at 11-12)

Nurse Anderson began working as Corizon's assistant director of nursing at NECC in January 2014. In April 2014, Nurse Anderson was promoted to director of nursing and, in September 2014, she became the health service administrator. Nurse Anderson testified that, as director of nursing, her job was to "make sure that the overall medical unit is following procedures." (ECF No. 64-9 at 5) The director of nursing also received, investigated, and responded to kites, or written requests from inmates, and participated in the offender grievance process by reviewing and responding to either the IRR or the offender grievance. (Id.) As health service administrator, Nurse Anderson was "responsible for the overall function of the medical unit" and oversaw the assistant director of nursing and director of nursing.

As previously discussed, "[d]elay in the provision of treatment or in providing examinations can violate inmates' rights when the inmates' ailments are medically serious or painful in nature." Dadd, 827 F.3d at 755 (quoting Johnson-El v. Schoemehl, 878 F.2d 1043, 1055 (8th Cir. 1989)); see also Phillips, 437 F.3d at 795-96. Viewed in the light most favorable to Plaintiff, the evidence shows that Plaintiff repeatedly sought medical treatment (specifically, consistent administration of his prescribed medications) from Nurse Anderson in person and in writing. The record includes Plaintiff's:

- Letter to Nurse Anderson dated April 2014, in which Plaintiff complained that he had not received the carbamazepine and prednisone prescribed ten days earlier.
- Letter to the Missouri Board of Registration for Healing Arts, copied to Nurse Anderson, dated January 1, 2015, stating that on-site physicians were not following Dr. Batchu's recommendations and regularly allowed his gabapentin and baclofen to expire without refills, causing him to "suffer through seizures, myoclonic jerks and severe muscle spasms for weeks before the eventually renew it."
- Letter to the warden, dated January 28, 2015, which the warden forwarded to

Nurse Anderson, complaining about a change in the med-line schedule and Corizon's failure to provide the corticosteroid injections, TENS unit, and Ensure recommended by his specialist.

Nurse Anderson also signed four IRRs filed by Plaintiff – two related to the failure to provide Plaintiff's prescribed medication, and two related to the failure to provide treatments, including corticosteroid injections, recommended by Dr. Batchu. Nothing in the record suggests that Nurse Anderson attempted to determine whether Plaintiff was indeed receiving his medication as prescribed. Nor does it appear that Nurse Anderson investigated the reasons, if any, for denying or delaying the treatments recommended by Dr. Batchu. See, e.g., Faruq, 531 Fed.Appx. at 761-62 (nurse administrator's failure to confirm the plaintiff's repeated representations that doctors had recommended and approved leg braces raised genuine issue of fact as to deliberate indifference).

This evidence in the record demonstrates a material factual dispute relating to whether Nurse Anderson was deliberately indifferent to Plaintiff's serious medical needs by refusing to provide Plaintiff's prescribed medications and recommended treatments. See, e.g., Cook v. Pueppke, 421 F.Supp.2d 1201, 1207 (E.D. Mo. 2006) (genuine issue of material fact as to whether nurse supervisor was deliberately indifferent in "refusing for eight days to permit [the plaintiff] the pain medication he had been prescribed."). The Court therefore denies Nurse Anderson's motion for summary judgment.

*C. Nurse Starks*

Nurse Starks moves for summary judgment on the ground that "Plaintiff's disagreement with Defendant Starks's decision to [deny] an [IRR] does not amount to deliberate indifference to a serious medical need[]." (ECF No. 54 at 6) In response, Plaintiff alleges, not only did Nurse Starks fail to satisfactorily resolve his IRRs, on "several occasions while treating or

providing medications to [Plaintiff], [Nurse] Starks suggested that [Plaintiff] was exaggerating or faking his symptoms." (ECF No. 62 at 13)

In her deposition, Nurse Starks testified that she "would have interactions" with Plaintiff when she distributed medications "through the med window," treated inmates in administrative segregation, and triaged inmates who presented to the medical unit with self-declared emergencies. (ECF No. 56-3 at 8-9) Nurse Starks also worked as assistant director of nursing during the relevant time period, and she signed and responded to Plaintiff's IRRs Nos. 15-144 and 15-168.

Plaintiff's claims against Nurse Starks are not based solely upon her involvement in the inmate grievance process. Plaintiff stated in his declaration that, between the expiration of his medications on November 17, 2014 and their renewal on December 3, 2014, Plaintiff "suffered severe pain, uncontrollable shaking, and convulsions, as well as numerous seizures," and he "repeatedly inquired into why I was not receiving my medications." (ECF No. 63 at ¶¶ 55, 56) On December 1, 2014 he "was rushed to the medical unit for seizures and convulsions." (Id. at ¶ 57) According to Plaintiff, Nurse Starks "did not know how to treat me, but instead suggested that I was faking my symptoms." (Id.) Nurse Starks denied accusing Plaintiff of "malingering or faking." (ECF No. 56-3 at 11)

Plaintiff demonstrated a material question of fact as to whether Nurse Starks accused him of faking his symptoms, refused to treat his seizures and convulsions, and failed to consistently provide his prescribed medications. Also, there exists a genuine question of fact as to whether Nurse Starks was deliberately indifferent in refusing to provide Plaintiff's medications as prescribed. For the reasons set forth above with respect to Nurse Anderson, the Court finds that there are material fact disputes that preclude entry of summary judgment on Plaintiff's claim that

Nurse Starks was deliberately indifferent in failing to treat his serious medical need.

### D. Corizon

Corizon argues that it is entitled to summary judgment because Plaintiff did not allege that Corizon's policy, custom, or official action caused his injury. (ECF No. 54 at 4) In response, Plaintiff argues that the several Corizon policies "directly contributed to [his] suffering." (ECF No. 62 at 16-17) More specifically, Plaintiff asserts that Corizon maintained a policy, practice, or custom of deliberate indifference to the serious needs of inmates by: (1) disregarding specialists' recommendations; (2) designating certain medications as non-formulary, which "invited reluctance on the part of Corizon's physicians and nurse practitioners to treat [Plaintiff's] conditions appropriately"; (3) immediately discontinuing medications when an inmate was caught diverting them; and (4) employing "a cast of rotating physicians." (ECF No. 62 at 16-17) Because Plaintiff failed to present evidence in support of these allegations, the Court grants Corizon summary judgment.

### IV. Conclusion

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment (ECF No. 53) is **GRANTED** in part and **DENIED** in part. Summary judgment is granted as to Defendant Corizon. Summary judgment is denied as to Dr. Babich, Nurse Anderson, and Nurse Starks.

This case will be set for trial by separate order.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 4th day of September, 2018